**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| KIMBERLY BYRD<br>8535 Fayette St.<br>Philadelphia, PA 19150<br><br>Plaintiff,<br><br>v.<br><br>SCHOOL DISTRICT OF PHILADELPHIA<br>440 N. Broad St.<br>Philadelphia, PA 19130,<br><br>Defendant. | *TRIAL BY JURY DEMANDED*<br><br>C.A. No:_____ 2:26-cv-4454 ___ |

**COMPLAINT**

Plaintiff, Kimberly Byrd, by and through her undersigned attorneys, files the within Complaint

*WITH DEMAND FOR TRIAL BY JURY*, and avers as follows:

**I.       PARTIES, JURISDICTION & VENUE**

1.       Plaintiff/Employee, Kimberly Byrd, is an adult female individual domiciled at the above-captioned address.

2.       Defendant/Employer, School District of Philadelphia, is the legal entity subject to jurisdiction of the EEOC, PHRC and PHCR.

3.       This Court has original federal question jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964 ("Title VII").

4.       This Court has supplemental jurisdiction over Plaintiff's claims brought under the Pennsylvania Human Relations Act, 43 Pa.C.S.§951 (the "PHRA").

5.       Plaintiff timely filed a Verified Charge with the EEOC, No: 530-2025-09752 (the "Charge") within 180 days (or alternatively 300 days) of the acts, pattern and practices as pled therein.

In addition, or in the alternative, the Charge alleged continuing pattern of discrimination; relief may be granted to all acts, pattern and practices regardless of when they occurred.

6.      On May 15, 2026, the EEOC issued Notice of Right to Sue. This Complaint is timely filed within 90 days of such notice.

7.      Venue is appropriate in this Court because the acts and omissions that give rise to this Charge occurred in Philadelphia, Pennsylvania.

8.      At all relevant times, Plaintiff is an "employee" and Defendant is an "employer" as defined in and/or within the meaning of all relevant laws, including Title VII, the PHRA and the Philadelphia Human Relations Ordinance.

## II.      FACTUAL ALLEGATIONS

9.      Plaintiff is employed by Defendant as Vice Principal.

10.     Plaintiff was hired by Defendant on or about August 2016. Plaintiff originally worked in the Office of Talent.  She became a teacher in or about August 2019.  In or about August 2021, she was promoted to Vice Principal.

11.     At all times while Plaintiff was employed by Defendant, Plaintiff's performance history was excellent.

12.     At all times material, Plaintiff was and is qualified for the position she held.  Plaintiff holds a bachelor's degree and two master's degrees.

13.     When Plaintiff was promoted to Vice Principal in August 2021, she was assigned to The Philadelphia High School for Creative and Performing Arts (known as "CAPA") on 901 S. Broad St., Philadelphia, PA 19147.

14.     Plaintiff was the first Black female Vice Principal at CAPA.

15. Despite the fact that Philadelphia is a majority Black city; and that the majority of teachers in the School District of Philadelphia are Black, CAPA has a disproportionately high number of White teachers.

16. The staff at CAPA has a history of discriminatory conduct against Black teachers and staff members.

**A.    The 2021-2022; 2022-2023 School Years.**

17. Shortly after Plaintiff was assigned to CAPA, the staff began a pattern of harassing and discriminatory conduct towards Plaintiff.  By way of example, and in no way limiting the foregoing, Plaintiff's supervisor at the time of Plaintiff's assignment to CAPA, Joanne Beaver (a White female) engaged in pervasive racially derogatory comments against Black students and staff.

18. In the 2021-2022 school year, Plaintiff complained of Beaver's misconduct. Defendant sustained those charges in November 2022, the following school year.  Beaver was "suspended" for a number of days, but Beaver did not miss any school days; she was not paid for certain holidays.

19. Beaver remained Principal until May 2023 when she was relieved of duties for misconduct not relating to her racial harassment and retaliation – she hit a White student.

20. In response to the charges sustained in November 2022, Beaver rallied staff against Plaintiff.  She asked if staff was part of "team Beaver" or "team Byrd."  She undermined Plaintiff's authority as Vice Principal.

21. Plaintiff complained of Beaver's subsequent discriminatory and retaliatory misconduct to Asst. Superintendent Ted Domers.

22. Domers met with Plaintiff in response to those complaints, but he failed and refused to take remedial action.

23.     Plaintiff told Domers that she felt physically, emotionally and psychologically unsafe in the environment in CAPA.  Domers flippantly told Plaintiff to work outside on the patio.

24.     When Beaver was terminated in May 2023 (for hitting a White student and not for her gross misconduct against Plaintiff and other Black staff), Plaintiff was named interim principal. However, Defendant failed to give Plaintiff the support or authority needed to perform in this role. By way of example, Plaintiff was excluded from planning events like prom and graduation.  Plaintiff was also not compensated as principal.

**B.      The 2023-2024 School Year**

25.     Jennifer Melendez (Hispanic female) was named interim Principal of CAPA to start the 2023-2024 school year. Melendez told Plaintiff during her first encounter that she "knew all about" Plaintiff and that Plaintiff would be respectful of her; that she was the Principal and expected to be treated as such.  Plaintiff was shocked.  Her complaints against Beaver, which were sustained, should never have been treated as undermining the authority of the principal.

26.     The pattern of racial animosity towards Plaintiff, other Black staff, and even Black students, continued unabated throughout the school year.  By way of example, and in no way limiting the foregoing:

a.  For Black history month, Melendez told Plaintiff that they should hire a caterer to hand out pieces of fried chicken to students.  Melendez looked at Plaintiff's face, clearly intending to shock and intimidate Plaintiff, and said, this isn't to be racist I just think it would be nice.

b.  Byrd reported that a White teacher referred to Black students as "darkies" and Defendant failed to take remedial action.  Complainant brought this issue to Melendez and brought students to Melendez who explained what was said. Melendez dismissed the complaints. Later, she asked Plaintiff if this was the hill she wanted to die on.

4

c. In or about January 2024, Joseph Ippolito, CAPA teacher, told Plaintiff that he had a dream that Plaintiff was "f***ing me up because you are so aggressive and intimidating."  This comment was made in front of Kiera Williams, a staff member who subsequently left CAPA because of the racially hostile environment.  Ippolito later shared a video with Plaintiff of Plaintiff breaking up a fight and made sexually explicit and racially charged comments about Plaintiff's buttocks. Plaintiff complained about Ippolito's misconduct to Melendez; Asst. Superintendent Richard Gordon; and DEI Director Hope Barnes.  No action was taken.

d. In February 2024, Marlene Goebig, CAPA teacher, produced a play called "And Then There Were None" by Agatha Christie.  Byrd objected to the play, which was originally titled "Ten Little N***ers."  Plaintiff complained to Melendez, Gordon and Barnes. Goebig was never disciplined as a result.

e. After Plaintiff complained about Goebig's play, Plaintiff was told she was not to interact with Goebig because Goebig was intimidated by Plaintiff.

f. Plaintiff was denied the opportunity to participate in graduation.

27.    Melendez was required to respond to Plaintiff's complaints of racial discrimination, against her and against students, by investigating the claims or referring the claims to the appropriate authorities of Defendant for investigation. Melendez failed and refused to do so.

28.    The DEI office failed and refused to investigate to Plaintiff's claims of racial discrimination against Plaintiff and against students.

29.    Plaintiff had several conversations in April-May 2024 with Asst. Superintendent Gordon about discrimination and retaliation she experienced and that students experienced. Gordon admitted to Plaintiff that CAPA was a racist school. Rather than remediate the racism, Gordon pressured Plaintiff to leave CAPA. Plaintiff refused. She was determined to stay.

30.     Gordon was required to respond to Plaintiff's complaints of racial discrimination, against her and against students, by investigating the claims or referring the claims to the appropriate authorities of Defendant for investigation. Gordon failed and refused to do so.

**C.      The 2024-2025 School Year**

31.     In or about August 2024, Plaintiff learned that staff at CAPA circulated a petition against Plaintiff. *Exhibit A* (the "Petition"). The Petition was circulated by staff in the aftermath of the "And Then There Were None" play discussed *supra*; Plaintiff learned of the Petition at the beginning of the 2024-25 school year.

32.     The Petition was signed by 25 staff members. 23 of those staff members are White.

33.     The Petition targeted Plaintiff for her complaints of racial discrimination and a hostile work environment as discussed *supra*.

34.     The Petition made false allegations of misconduct and incompetence by Plaintiff.

35.     Plaintiff was contacted by the King Spry Law Firm, which investigated the claims in the Petition. Plaintiff met with attorneys from that firm for 13 hours. The focus of that investigation was to determine whether Plaintiff had committed wrongdoing; King Spry did not investigate any of the claims of discrimination or retaliation against her and against students. Plaintiff never heard back from King Spry about the investigation; Plaintiff was subjected to a lengthy and hostile interview in retaliation for her complaints of discrimination.

36.     In the 2024-2025 school year, Alonzo Fulton, a Black male, was appointed Principal of CAPA. In the year prior, Fulton attended meetings about the "And Then There Were None" play and was aware of the racially hostile environment experienced by Plaintiff and by students at CAPA.

37.     At the beginning of the school year, Fulton told Plaintiff that she should be happy that a Black principal was in charge, that Plaintiff should not have any concerns, and should be okay.

6

38. However, very quickly into his tenure, it was clear that Fulton attempted to appease White staff members. He excluded Plaintiff from interactions with staff and otherwise marginalized Plaintiff in her role as Vice Principal.

39. In or about October 2024, Fulton told Plaintiff that some of the White people seemed to be intimidated by Plaintiff's presence. He said that, because Plaintiff is a tall Black woman, she should lower her shoulders and lower her posture because White people were intimidated by her. Plaintiff was shocked.

40. Throughout this school year, Fulton inhibited Plaintiff from performing core duties of a Vice Principal. She was never allowed to interact with teachers without supervision from Fulton. Plaintiff spent most of her time in her office and was left with menial tasks like answering the phone. Plaintiff attended group meetings only when Fulton was also present.

41. In or about January 2025, a group of 12th grade Black female students complained to Plaintiff that a European theatre production was being produced and overseen by Goebig (the same teacher who led "And Then There Were None" as discussed *supra*.

42. Goebig relegated Black female students to audition for the role of maid. Goebig refused to consider Black students for lead roles, which went to White students. Plaintiff reported this to Fulton; Ahn Nguyen, Assistant Superintendent; Michele Thornton, DEI lead officer. No action was taken.

43. Parents of the student who was denied the opportunity to audition for a lead role scheduled meetings with Fulton on four separate occasions. Fulton attended only one meeting, and Fulton refused to allow the parents to speak with Goebig.

44. Plaintiff continued to experience a hostile work environment. Teachers spread rumors about Plaintiff and staff refused to work with Plaintiff. Plaintiff complained to Fulton and Fulton took no remedial action.

7

45. The NAACP complained to Defendant on Plaintiff's behalf. Defendant's Labor Relations Department contacted Plaintiff and Plaintiff demanded an investigation into the racially hostile environment and retaliation Plaintiff suffered. Defendant failed to conduct such an investigation.

46. On or about May 1, 2025, Plaintiff suffered a panic attack. She took leave of absence until on or about June 2, 2025.

47. When she returned, Plaintiff learned that she faced discipline for complaints of misconduct that were exaggerated by staff from CAPA. In particular, Plaintiff was tasked with converting test scores to percentages for grades. This was not Plaintiff's responsibility. There were, allegedly, some errors in the grades submitted. It is believed, and therefore averred, that a comparator who did not face discrimination would not have been disciplined at all for the alleged misconduct. Such allegations were a pretext for discrimination and/or retaliation.

48. On or about June 24, 2025, Plaintiff asked to be voluntarily transferred away from CAPA. This was a constructive forced transfer; Plaintiff could not reasonably be expected to continue performing her duties in that environment.

49. On July 15, 2025, Defendant granted Plaintiff's transfer request. Plaintiff was transferred to West Philadelphia High School. This is a standard high school, not the specialty school as she was previously assigned. This is, in effect, a demotion.

50. On or about August 14, 2025, Plaintiff learned that she would suffer a three day suspension, without pay, as a result of this alleged infraction.

51. On August 19, 2025, Plaintiff had a meeting with Assistant Superintendent Nguyen. Nguyen threatened to change Plaintiff's transfer from CAPA to West Philadelphia High as a disciplinary transfer, in addition to the three-day unpaid suspension. This threat was carried out on

September 3, 2025. This prevents Plaintiff from ever returning to CAPA and otherwise mars her record. Comparators would not suffer this level of discipline for this alleged infraction.

52. At the August 19, 2025 meeting, Plaintiff informed Nguyen that the disciplinary hearing was opened against Plaintiff for discriminatory and/or retaliatory reasons. Plaintiff reminded Nguyen of the complaints or racism which Plaintiff made to Nguyen prior to this that were never resolved. Nguyen dismissed these concerns. Nguyen has continued her pattern and practice of refusing to investigate these claims.

53. Defendant's misconduct has caused Plaintiff great anxiety, sleeplessness and distress.

54. As a direct and proximate result of Defendant's misconduct, Plaintiff was injured in the following ways:

    a. Lost wages, back pay and future wages;
    b. Lost prospective earning and diminished earning capacity;
    c. Lost benefits;
    d. Loss of the ability to advance through the ranks at Defendant's employment and other professional opportunities;
    e. Extreme embarrassment, humiliation and grave reputational harm;
    f. Severe emotional distress; and
    g. Such other damages as has been set forth in detail above and incorporated herein by reference and as will be established through the course of discovery.

55. Plaintiff is entitled to attorney's fees and costs incurred to enforce her civil rights.

## III. CAUSES OF ACTION

### COUNT I     RACE DISCRIMINATION

56. Repeats and realleges paragraphs 1-54 as if set forth at length herein.

57. The conduct described above constituted intentional discrimination.

58. Defendant caused Plaintiff to suffer adverse employment actions that affected Plaintiff's employment in a serious and tangible way with respect to Plaintiff's compensation terms, conditions and/or privileges of employment, as is set forth above and incorporated herein by reference. Such adverse actions include, but are not limited to:

a. Limiting Plaintiff's job duties;
b. Assigning Plaintiff to loathsome or unpleasant tasks;
c. Excluding Plaintiff from meetings and otherwise limiting Plaintiff's communications with others;
d. Discipline, including a meritless disciplinary investigation;
e. Allowing a racially hostile work environment to pervade, even after Plaintiff's complaints;
f. Causing Plaintiff to experience extreme emotional distress
g. Constructively transferring Plaintiff out of a coveted assignment at a magnet school due to intolerable conditions;
h. Reclassifying Plaintiff's transfer as disciplinary for pretextual reasons and to prevent Plaintiff from regaining the assignment.

59. Plaintiff's race, Black, was a motivating factor in discriminating against Plaintiff. In addition, or in the alternative, Plaintiff's race, Black, was a determinative factor in Defendant's decisions to discriminate against Plaintiff.

60. There was a pervasive pattern of adverse employment actions that affected Plaintiff throughout her tenure at CAPA, culminating in a constructive demotion and stigmatizing disciplinary record.

61. As a direct and proximate result of Defendant's discrimination, Plaintiff suffered injury, as set forth above and incorporated herein by reference.

## COUNT II    RETALIATION

62. Repeats and realleges paragraphs 1-61 as if set forth at length herein.

63. Plaintiff engaged in protected activities, as set forth above and incorporated herein by reference. Such activities include, but are not limited to:

a. Complaining about racially discriminatory conduct directed against her on several occasions;
b. Complaining about racially discriminatory conduct directed at others on several occasions;
c. Informal and formal complaints to her principals;
d. Complaints to Defendant's assistant superintendents responsible for addressing racially discriminatory and hostile work environments;
e. Complaints to other officers responsible for remediating discrimination and hostile work environments.

64. Defendant took adverse actions against Plaintiff, as set forth above and incorporated herein by reference.

65. There is a causal connection between the protected activities and the adverse actions.

66. As a direct and proximate result of Defendant's misconduct, Plaintiff suffered injury as set forth above and incorporated herein by reference.

### COUNT III    PENNSYLVANIA HUMAN RELATIONS ACT

67. Repeats and realleges paragraphs 1-66 as if set forth at length herein.

68. For all the reasons why Defendant violated Title VII as set forth above, Defendant also violated the Pennsylvania Human Relations Act.

69. As a direct and proximate result of Defendant's misconduct, Plaintiff suffered injury as set forth above and incorporated herein by reference.

### COUNT IV    PHILADELPHIA FAIR PRACTICES ORDINANCE

70. Repeats and realleges paragraphs 1-70 as if set forth at length herein.

71. The foregoing violations of Title VII and PHRA also constitute violations of PFPO.

72. As a result of Defendant's discriminatory conduct, Plaintiff suffered harassment and several adverse employment actions as set forth above and incorporated herein by reference.

73. As a direct and proximate result of Defendant's misconduct, Plaintiff suffered injury as set forth above and incorporated herein by reference.

### IV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kimberly Byrd respectfully requests this Court enter judgment in her favor and against Defendant, School District of Philadelphia, and award all relief available under the applicable laws, including but not limited to:

a. Back pay, lost wages, lost benefits, and other economic losses;
b. Front pay and/or reinstatement, to the extent available and appropriate;

11

c. Compensatory damages for emotional distress, humiliation, embarrassment, reputational harm, and other non-economic injuries;

d. liquidated damages in an amount equal to Plaintiff's unpaid wages, back pay, and/or other wage losses to the extent available under the Equal Pay Act, and such other liquidated damages as may be available under the applicable laws;;

e. Prejudgment interest and post-judgment interest;

f. Reasonable attorney's fees, litigation expenses, and costs of suit (including expert costs);

g. Other equitable relief necessary to make Plaintiff whole for injuries and losses not fully remedied by an award of money damages; and

h. Such other relief as this Court deems just and proper.

*TRIAL BY JURY DEMANDED*

Respectfully submitted,

CREECH & CREECH, LLC

/s/ Timothy P. Creech
TIMOTHY P. CREECH
1835 Market St., Suite 2710
Philadelphia, PA 19103
(215) 575-7618; Fax: (215) 575-7688
Timothy@CreechandCreech.com

DATED:      June 29, 2026